FILED

OCT 24 2022

Mark C. McCartt, Clerk
U.S. DISTRICT COURT

AO-106 (Rev: 06/09)-Application for Search Warrant

# UNITED STATES DISTRICT COURT

for the

Northern District of Oklahoma

| | |
|---|---|
| In the Matter of the Search of<br>*Information Associated with the Google Account in the*<br>*Matter of the Search of the Email Accounts*<br>*REED@RJOF.COM and ADMIN@RJOF.COM*<br>*Under the Control of Google, LLC Whose offices are*<br>*Located at 1600 Amphitheatre Parkway Mountain View,*<br>*Ca 94043* | )<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Case No. 22- MJ-675-SH

**FILED UNDER SEAL**

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attachment "A." This court has authority to issue this warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A).
located in the __Northern__ District of __California__, there is now concealed *(identify the person or describe the property to be seized):*

See Attachment "B"

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 26 U.S.C. § 7201 | Tax Evasion |
| 26 U.S.C. § 7206(1) | False Returns |
| 26 U.S.C. § 7206(2) | Aiding and Assisting in the Preparation of False Returns |
| 18 U.S.C. § 371 | Conspiracy |

The application is based on these facts:

See Affidavit of SA Peter Woodson attached hereto.

☑ Continued on the attached sheet.

☐ Delayed notice of ____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Peter Woodson, CI IRS
*Printed name and title*

Sworn to before me by phone.

Date: 10/24/22

_____
*Judge's signature*

City and state: Tulsa, Oklahoma

Susan E. Huntsman, U.S. Magistrate Judge
*Printed name and title*

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF THE EMAIL ACCOUNTS REED@RJOF.COM AND ADMIN@RJOF.COM UNDER THE CONTROL OF GOOGLE, LLC WHOSE OFFICES ARE LOCATED AT 1600 AMPHITHEATRE PARKWAY MOUNTAIN VIEW, CA 94043 | Case No. 5-59N-8420<br><br>**Filed Under Seal** |

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEARCH WARRANT**

I, Peter Woodson, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.      I make this affidavit in support of an application for a search warrant for information associated with certain email accounts, **REED@RJOF.COM** and **ADMIN@RJOF.COM,** belonging to REED JULES OPPENHEIMER of Tulsa, Oklahoma, which is stored at premises controlled by Google, LLC (Google) an e-mail provider headquartered at 1600 Amphitheatre Parkway, Mountain View, CA 94043. The information to be searched in connection with this email account is described in the following paragraphs and in Attachment B, attached hereto and incorporated herein by reference. This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Google to disclose to the government copies of the information (including the content of communications) further described in Attachment B. The period covered for REED OPPENHEIMER's Google e-mail addresses referenced herein is from January 1, 2016, to the date of this application.

2.      I am a Special Agent with the Internal Revenue Service, Criminal Investigation ("IRS-CI") and have been so employed since 2019. I have been trained in accounting and financial investigative techniques at the Federal Law Enforcement Training Center. My formal education includes a Bachelor's degree in Business Administration with an Accounting focus from Rogers State University in Claremore, OK and a law degree from the University of Tulsa College of Law. I am a CPA licensed in Oklahoma and non-practicing member of the Oklahoma Bar.  During my time as a Special Agent with IRS-CI, I have conducted multiple investigations involving criminal tax and related criminal financial violations.  During these investigations, I have gained experience in analyzing records to determine whether taxes are due; debriefing defendants, cooperating witnesses and other persons who have had personal experience and knowledge of the activities associated with fraud schemes; and other investigative techniques pertinent to criminal violations of the tax and related financial laws.

3.      Based on my training and experience and the facts as set forth in this affidavit, probable cause exists to believe that violations of 26 U.S.C. §§ 7201 (Tax Evasion), 7206(1) (False Returns), 7206(2) (Aiding and Assisting in the Preparation of False Returns) and 18 U.S.C. §371 (Conspiracy)  have been committed by REED OPPENHEIMER; namely, that OPPENHEIMER has promoted and participated in an abusive tax shelter scheme through which he and his "investors" have evaded millions of dollars in taxes by overvaluing their interest in conservation easements and claiming related charitable deductions which significantly exceed the amount of the investors' investment, thereby reducing their taxable income.  Your affiant submits that OPPENHEIMER's email accounts (as more particularly described in Attachment A) will contain evidence, instrumentalities, and fruits of these crimes, as further described in Attachment B.  Because this affidavit is submitted for the limited purpose of showing that

2

probable cause exists that the email accounts admin@rjof.com and reed@rjof.com contains

evidence, instrumentalities, and fruits of violations of 26 U.S.C. §§ 7201, 7206(1), 7206(2) and

18 U.S.C. §371, it does not set forth all information known to me regarding this matter at this

time.

## JURISDICTION

4.      This Court has jurisdiction to issue the requested warrant because it is "a court of

competent jurisdiction" as defined by 18 U.S.C. § 2711, 18 U.S.C. §§ 2703(a), (b)(1)(A) and

(c)(1)(A).  Specifically, the Court is "a district court of the United States . . . that – has

jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

## PROBABLE CAUSE

Based on the investigation to date, including witness statements and my review of documents

obtained in the investigation, I have learned the following:

5.      A conservation easement is a legal agreement between a landowner and another

party, generally a land trust or government agency, that permanently restricts the development

and/or use of land with the purpose of achieving certain conservation or preservation goals.

6.      In the federal tax context, while a taxpayer may take a deduction for any

charitable contribution made during the taxable year (subject to certain limitations), a deduction

is generally not allowed for a taxpayer's contribution of a partial interest in property.  The

Internal Revenue Code provides for certain exceptions where a deduction of a partial interest in

property is permitted, one of which is for the donation of a "qualified conservation contribution."

A "qualified conservation contribution" is defined as contribution of, (A) a qualified real

property interest, (B) to a qualified organization, (C) made exclusively for conservation

purposes.  Before a deduction can be claimed, however, certain criteria must be met.  One of

3

those criteria is that the conservation easement's value must be determined by a qualified appraisal prepared in accordance with generally accepted appraisal standards.

7.      OPPENHEIMER's conservation easement scheme, described in this Affidavit, hinges upon the use of entities taxed as a partnership under subchapter K of the Internal Revenue Code. OPPENHEIMER uses entities organized as limited liability companies (LLCs) under state law. Each conservation easement syndicate (a multi-tiered LLC investment) is a state law entity that is taxed as a partnership and is a pass-through entity for federal tax purposes. By utilizing a pass-through entity, OPPENHEIMER was able to deliver the inflated tax deductions to investors in the scheme.

8.      An entity taxed as a partnership generally is not directly liable for income tax; instead, its partners are liable for income tax in their separate or individual capacities based on the income, losses, deductions, or credits that flow from the entity. Because of the structure in which partnerships "pass through" income and losses to their partners, they are commonly referred to as "pass through" or "flow through" entities.

9.      OPPENHEIMER's conservation easement syndication appears to be highly structured and typically involves multiple tiers of entities. At the very least, the scheme for each transaction involves one LLC, taxed as a partnership in which customers "invest," and another entity in which close associates of OPPENHEIMER retain interests along with landowners. On some occasion, close associates received their interest in the so-called Property Companies or PropCos by gift or other reduced value transaction. Based on my training and experience, the general pattern of the scheme used by other conservation easement promotors and, it appears by OPPENHEIMER, is as follows:

- STEP 1:  The promotor (OPPENHEIMER) creates a conservation easement syndicate or identifies an existing LLC that can be turned into a conservation easement syndicate.  If the LLC does not own the real property at issue, the real property is contributed by its owners (sometimes another LLC) in exchange for LLC membership interests in a "PropCo" by means of a transaction that is considered a "nonrecognition" transaction for federal tax purposes.  This means the parties to the transaction do not generally have to recognize the gain or loss on the transaction for federal tax purposes.

- STEP 2:  The LLC acts through a manager, in this case OPPENHEIMER.  Generally, the services provided by the manager include hiring an appraiser and assisting with determining the highest and best use of the property to be used in the appraisal. In OPPENHEIMER's transactions, generally, a separate Investor Company (InvestCo) obtains and holds a substantial interest in the underlying PropCo.  External investors purchase membership interests of the InvestCo.

- STEP 3:  The appraiser prepares an "initial valuation" of the property conservation easement.  Here, in creating their initial valuation, the promoter's appraisers often utilize unrealistic assumptions, violate the standards governing appraisal practice, and otherwise prepare valuations that grossly overvalue the conservation easement.  This initial valuation is used to market and sell the LLC interests.  OPPENHEIMER and his sub-promotors in this scheme use the overstated valuation to promise a 4 to 5 multiple returns on investment to potential investors and in certain instances, upwards of 10 multiples in certain transactions with trusted or more limited scope potential investors.

- STEP 4:  The LLC interests are marketed and sold in some instances as securities and in some instances as some other kind of land investment.  The LLC interests are generally

5

marketed to taxpayers who, without the deductions stemming from the LLC interests, would be in the highest federal income tax brackets. While OPPENHEIMER has registered at least one syndicate as a security, he has told potential investors that many of his transactions are not registered and do not offer formal prospectus statements or Private Placement Memoranda.

- STEP 5: An appraiser, generally the same person who provided the initial valuation, finalizes the value of the conservation easement by final appraisal that purports to be a qualified appraisal. The appraiser generally uses the same false assumptions and methodology as used in the initial valuation to arrive at approximately the same grossly overstated value.

- STEP 6: The partnership donates the easement to a charitable entity.

- STEP 7: A return preparer prepares the LLC's tax returns, Form 1065 and accompanying schedules reporting the conservation easement as a charitable deduction. As part of this process, the return preparer also prepares the Schedules K-1 for each customer/LLC member on which the customer's share of the conservation easement deduction is reported.

- STEP 8: Customers file their income tax returns, Forms 1040, utilizing the overvalued charitable contribution deductions arising from the conservation easement LLC. The improper and overstated deductions ultimately reduce the customers' reported tax liabilities. Per the Internal Revenue Code, the conservation easement deductions can reduce the customer's Adjusted Gross Income (AGI) by 50%, then the taxpayer may carry forward any additional deductions to future tax years. For example, a taxpayer with AGI of $600,000 who receives a conservation easement Schedule K-1 with deductions of

6

$350,000 may deduct $300,000 in the year of the transaction and carry forward $50,000 in deductions to the following tax year.

10.     Companies or individuals who meet certain criteria related to providing advice on conservation easements are required to file IRS Forms 8918, Material Advisor Disclosure Statements, to disclose information regarding the transactions.   In addition, companies or individuals who participate in certain reportable transactions, including conservation easements, are required to file IRS Forms 8886, Reportable Transaction Disclosure Statements.

11.     IRS Notice 2017-10 describes syndicated conservation easement transactions and identifies the potential abuse of the easements for tax purposes.  As indicated in the notice, the individuals involved in these transactions sometimes overvalue the easement and claim charitable deductions which significantly exceed the amount of the investor's investment.

12.     The subject, REED OPPENHEIMER, was identified through the above-referenced forms as being a promotor and participant in conservation easement "investments." Through various companies, OPPENHEIMER and others obtain and hold land through a pass-through entity, establish a conservation easement, then donate the easement to a non-profit entity. The easements created in this scheme are actually donated as required.  However, the appraisals OPPENHEIMER obtained that valued the donated easements appear on their face to be substantially overvalued, resulting in overinflated deductions being passed on to investors. Several entities have been identified as having been established by OPPENHEIMER and several of them solicited and sold interests in the syndicates, which would then report substantially overvalued charitable donation deductions to the investors, who provided cash or other payments into the scheme.

13.     As one example of OPPENHEIMER's transactions, IRS records show that Extraction Partners, LLC, and Verdigris River Quarry Three LLC (VRQ3) are two of the companies set up by OPPENHEIMER that participated in a syndicated conservation easement scheme.  As stated above, OPPENHEIMER and his associates have created a complex structure of entities under which various companies operate as PropCo's and others operate as InvestCo's. In this case, the PropCo is believed to be VRQ3 and the InvestCo is Quarry Investors 3, LLC. Accordingly, though the companies are all associated, certain companies purchase, or receive by donation for investment interests, pieces of property which are then divided to create a conservation easement property for donation.  IRS records, including individual and partnership tax returns, along with accompanying information filings, indicate that OPPENHEIMER has set up at least one LLC, which has created an easement and sold interests in the LLC, for each tax year since 2016.  The following illustrates, per the disclosure forms (Form 8886 as referenced above) filed by OPPENHEIMER with the IRS, and other publicly available records, a conservation easement investment promoted by OPPENHEIMER and his associates:

- A 1,396-acre property in or near Oologah, Oklahoma was obtained in or around December 14, 2018, by unrelated landowner, Freeby Ranch, LLC, managed by Gary Freeby of Oologah, Oklahoma, for a purchase price of approximately $1.2 million.

- County records reflect that Freeby Ranch, LLC, transferred three subdivided tracts of the above property to Extraction Partners, LLC, on August 8, 2020.  Extraction Partners, LLC, had three members, including REED OPPENHEIMER, Gary Freeby, and Todd Hudgens. REED OPPENHEIMER is the manager of Extraction Partners, LLC. Subsequently, on September 18, 2020, Extraction Partners, LLC, transferred 94.7 acres to VRQ3.  Due to the way the property was subdivided for the easements, it is difficult to fully ascertain the assessed value

8

of the actual 94.7 subdivided acres transferred pursuant to this specific syndicated easement. However, the purchase price of the entire 1,396 acres was $1,191,500, resulting in an estimated $81,403 value for the 94.7-acre subdivided tract at a per-acre rate, which should represent the highest possible value of the subject land based on an arm's length sales price negotiated between unrelated buyer and seller. The tax assessed value of the 94.7-acre tract described above in 2020, and 2021 was $18,713.

- A conservation easement was created on the 94.7-acre tract held by VRQ3 on December 21, 2020. Quarry Investors 3, LLC, holding a partial interest in VRQ3, sold units to approximately 55 investors, for a total of $3,131,000, which is approximately 38 times the estimated FMV of the 94.7-acre tract per the 2018 sale transaction and approximately 2.6 times the value of the entire 1,396-acre parcel acquired by Freeby Ranch, LLC in the 2018 sale transaction.

- VRQ3 obtained an appraisal in 2020 valuing the conservation easement at $14,120,000, which is more than 173 times the estimated 2018 sale transaction price and 4.5 times the amount contributed by "investors" in Quarry Investors 3, LLC.

- VRQ3 donated the easement to a non-profit entity, Compatible Lands Foundation of Tulsa, Oklahoma.

- VRQ3 claimed, for the 2020 tax year, charitable contributions in the amount of $14,120,000 for the donation of the easement. The company distributed K-1s to the investors for their share of charitable contributions generated by donation of the conservation easement. The value of the property, as described above, is clearly significantly less than both the $3,131,000 collected from the investors and the $14,120,000 value assigned to the easement by the appraiser and reported to the investors as charitable deduction donations on their Forms K-1. This means

9

that for each dollar an investor paid into the LLC, he/she received approximately $4.51 in charitable contribution tax donations. Those deductions significantly reduced the taxable income of those investors. My review of tax returns of some of the investors in VRQ3 and related syndicates shows that the investors claimed charitable contribution deductions of up to one half of their Adjusted Gross Income based on charitable deductions from the significantly overvalued easement donation described in this affidavit.

14.     The result of the above transactions is that a 94.7-acre tract of property with an assessed value of $18,713 and approximated sales price of $81,403, at the most, was appraised at $14,120,000 within a two-year period.

15.     In tax year 2020, OPPENHEIMER himself claimed non-cash charitable contribution deductions of $5,020,0185, from the above-described transaction, along with several other similar transactions following the same pattern, resulting in a decrease in OPPENHEIMERS's gross income for tax purposes from $10,040,370 to $5,020,185 before application of additional deduction and credit items.

## BACKGROUND CONCERNING E-MAIL

16.     According to IRS records, including individual and partnership tax returns, along with accompanying information filings, OPPENHEIMER has taken or attempted to take charitable contribution deductions for his participation in his own conservation easement syndicates. Beginning in tax year 2016 and continuing to present, OPPENHEIMER claimed charitable deductions related to conservations on his individual Form 1040, U.S. Income Tax Return. Based on review of OPPENHEIMER's filed returns and data within the Individual Master File (IMF), OPPENHEIMER has claimed these deductions on Form 1040 Schedule A, as

10

deductions from charitable contributions in a form other than cash.  From 2016 through 2019, OPPENHEIMER claimed contribution amounts of $3,671,258, $2,234,309, $9,346,684, and $3,354,123, respectively.  He claimed a portion of these amounts, limited by his Adjusted Gross Income and other factors, carrying forward the remainder into future tax years.  The amounts deducted were $501,994, $810,509, $2,726,729, and $3,367,123.  For 2020, IRS data indicated that OPPENHEIMER has filed a return consistent with years past, which included a Schedule A contribution amount of $5,020,185, which, based on the continuing conservation easement activity and previous years, would consist primarily of the types of charitable contributions described above in the current year, with some carry-forward from previous tax periods.

17.    Investigators have received information regarding instances where OPPENHEIMER has used the subject email addresses, **admin@rjof.com** and **reed@rjof.com**, in the course of facilitating the above-described conservation easement scheme.  In relation to reed@rjof.com, those instances include:

a.    an email from **reed@rjof.com** dated December 24, 2021, from OPPENHEIMER to an undercover agent acting as a potential investor (the UCA) where OPPENHEIMER included promotional materials related to a previous SCE transaction and referenced future SCE activities;

b.    an email from **reed@rjof.com** dated February 21, 2022, from OPPENHEIMER to the UCA, confirming an upcoming meeting regarding SCE transactions; and

c.    an email from reed@rjof.com dated February 23, 2022, from OPPENHEIMER to the UCA containing revised and updated promotional materials along with information regarding a then current SCE transaction, stating that fifty (50) units in that transaction were still available.

18.     Based on publicly available archival copies and domain registration information, OPPENHEIMER has operated the rjof.com domain since at least 2015.  In 2015, the "Contact" section of the page referenced REED OPPENHEIMER specifically, and directed e-mails to the address, **admin@rjof.com**.  In 2016 promotional materials related to the Valley Park Ranch, LLC series of transactions, OPPENHEIMER included his name and a reference to contact him at rjof.com.  The VPR series of transactions ran generally from 2016 through 2017, included three entities, and one of the transactions is the subject of ongoing U.S. Tax Court litigation.  During 2018 and 2019, OPPENHEIMER promoted the Verdigris Valley Office Park series of transactions, including six entities. The promotional materials also included references to OPPENHEIMER contact availability through the rjof.com domain.  OPPENHEIMER also promoted a series of transactions, including seven entities called Pecan Grove Office Park, which were implemented in or around 2019 and 2020.  In the environmental baseline study materials relating to promotion of that project that were prepared as part of the conservation easement process, OPPENHEIMER provided his e-mail address as **reed@rjof.com** and made additional references to rjof.com generally in the related promotional materials.

19.     In 2016, OPPENHEIMER opened a checking account with Bank of Oklahoma Financial, NA, in the name of Valley Park Investors, LLC, which appeared to receive contributions from investors as part of the Valley Park Ranch series of transactions.  The e-mail address BOKF maintained for OPPENHEIMER was **reed@rjof.com**.  OPPENHEIMER provided promotional materials for the Verdigris Valley Office Park series of transactions which included references to the rjof.com domain as a source to obtain additional information.

20.     In January of 2022, during a conversation with a UCA, OPPENHEIMER stated that they often use a "four and five" time multiple return for investors, but that there was no real

maximum.  OPPENHEIMER further provided that, in the event an investor was seeking a larger

deduction, they could establish an individual deal for that investor.  Based on review of a

sampling of investor returns from various SCEs promoted by OPPENHEIMER, the ratio of

contributions to deductions has consistently fallen between four and five.

21.     In February of 2022, during a meeting that occurred in or around Tulsa,

Oklahoma, OPPENHEIMER stated to a UCA that he uses e-mail to conduct the voting by

investors related to the SCE scheme discussed above.  In the same conversation and follow-up

phone calls, OPPENHEIMER and his advisors state that the voting never has any result other

than establishing a conservation easement and that votes for alternatives would be wrong.  For

example, in reference to investors voting for a development project versus establishing a

conservation easement, OPPENHEIMER, responding to an inquiry by a UCA, OPPENHEIMER

replied "You mean if the voting goes the wrong way" after which, OPPENHEIMER's associate

and financial advisor, Clayton Woodrum, replied "It doesn't." OPPENHEIMER goes further to

elaborate "[W]ould your investors vote to put in an office park instead of turning it into a 6 to 1

write off?" After the UCA responds negatively, OPPENHEIMER replied "And, and nobody,

nobody else is either…"

22.     IRS documents, including individual and partnership tax returns, along with

accompanying information filings, show that most of the investors in VRQ3 and the other

companies through which OPPENHEIMER operates this above-described conservation easement

scheme live in states other than Oklahoma.  Specifically, a percentage of the investors live in

Arizona, New Mexico, Missouri, and California.  Based on my training and experience,

individuals who sell investments communicate with investors and potential investors,

particularly those located in other states, via email.

13

23.     Receiving images of OPPENHEIMER's email communications with investors and appraisers will substantially further the investigation into this scheme. Specifically, agents expect that the emails will reflect the representations being made by OPPENHEIMER to the investors. In addition, the emails may reflect communications with the appraisers who prepared the appraisals related to this scheme and are believed to be falsely inflating the values of the same.

24.     Based on my training and experience, I know that people engaged in fraud schemes often communicate with others through correspondence or other documents (whether digital or written) which could tend to identify the means or manner of the scheme.

25.     In my training and experience, I have learned that Google provides a variety of on-line services, including e-mail access, to the public. Google allows subscribers to obtain e-mail accounts with other domain names, like the e-mail account listed in Attachment A. Subscribers obtain an account by registering with Google. During the registration process, Google asks subscribers to provide basic personal information. Therefore, the computers of Google are likely to contain stored electronic communications (including retrieved and unretrieved e-mail for Google subscribers) and information concerning subscribers and their use of Google services, such as account access information, e-mail transaction information, and account application information. In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.

26.     A Google subscriber can also store with the provider files in addition to e-mails, such as address books, contact or buddy lists, calendar data, pictures (other than ones attached to e-mails), and other files on servers maintained and/or owned by Google. In my training and

14

experience, evidence of who was using an e-mail account and who may have been involved in the alleged crimes, may be found in address books, contact or buddy lists, e-mail in the account, and attachments to e-mails, including pictures and files.

27.     In my training and experience, e-mail providers generally ask their subscribers to provide certain personal identifying information when registering for an e-mail account. Such information can include the subscriber's full name, physical address, telephone numbers and other identifiers, alternative e-mail addresses, and, for paying subscribers, means and source of payment (including any credit or bank account number). In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.

28.     In my training and experience, e-mail providers typically retain certain transactional information about the creation and use of each account on their systems. This information can include the date on which the account was created, the length of service, records of log-in (i.e., session) times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account (such as logging into the account via the provider's website), and other log files that reflect usage of the account. In addition, e-mail providers often have records of the Internet Protocol address ("IP address") used to register the account and the IP addresses associated with particular logins to the account. Because every device that connects to the Internet must use an IP address, IP address information can help to identify which computers or other devices were used to access the e-mail account.

29.     In my training and experience, in some cases, e-mail account users will communicate directly with an e-mail service provider about issues relating to the account, such

as technical problems, billing inquiries, or complaints from other users.  E-mail providers

typically retain records about such communications, including records of contacts between the

user and the provider's support services, as well records of any actions taken by the provider or

user as a result of the communications.  In my training and experience, such information may

constitute evidence of the crimes under investigation because the information can be used to

identify the account's user or users, and notice to such users of their alleged offenses, and thus

potentially relevant to issues of intent.

## CONCLUSION

30.    Based on the forgoing, probable cause exists to believe that the e-mail accounts

**reed@rjof.com** and **admin@rjof.com** (as more particularly described on Attachment A,

attached hereto and incorporated herein by reference) will contain evidence, instrumentalities

and fruits of violations of 26 U.S.C. §§ 7201, 7206(1), 7206(2) and 18 U.S.C. §371, as further

described in Attachment B attached hereto and incorporated herein by reference.   The period

covered for OPPENHEIMER's Google e-mail address referenced herein is from January 1, 2016

to the date of this application.  Accordingly, I request that this Court issue the requested warrant.

Further, since the warrant will be served on Google, which will then compile the requested

records at a time convenient to it, there exists reasonable cause to permit the execution of the

requested warrant at any time of the day or night.

## REQUEST FOR SEALING

31.    I further request that the Court order that all papers in support of this application,

including the affidavit and search warrant, be sealed until further order of the Court.  These

documents discuss an ongoing criminal investigation that is not public knowledge, and the

details of which are not believed to be known to the targets of the investigation.  Accordingly,

good cause exists to seal these documents because their premature disclosure may seriously

jeopardize this investigation.

  I declare under penalty of perjury that the foregoing information is true and correct to the

best of my knowledge and belief.



        Respectfully submitted,

        /s/

        Special Agent

        Internal Revenue Service, Criminal

        Investigation



Subscribed and sworn to before me on $\underline{24^{th}}$ day of $\underline{October}$ , 2022.



        SUSAN E. HUNTSMAN

        UNITED STATES MAGISTRATE JUDGE

17

## ATTACHMENT A

### Property to Be Searched

This warrant applies to information associated with **admin@rjof.com** and **reed@rjof.com** that is stored at premises controlled by Google, LLC a company that accepts service of legal process at 1600 Amphitheatre Parkway, Mountain View, CA 94043.

## ATTACHMENT B

### Particular Things to be Seized

**I.      Information to be disclosed by Google, LLC (the "Provider")**

To the extent that the information described in Attachment A is within the possession, custody, or control of the Provider, including any emails, records, files, logs, or information that has been deleted but is still available to the Provider, the Provider is required to disclose the following information to the government for each account or identifier listed in Attachment A:

a.      The contents of all e-mails associated with the account, including stored or preserved copies of e-mails sent to and from the account, draft e-mails, the source and destination addresses associated with each e-mail, the date and time at which each e-mail was sent, and the size and length of each e-mail;

b.      All records or other information regarding the identification of the account, to include full name, physical address, telephone numbers and other identifiers, records of session times and durations, the date on which the account was created, the length of service, the IP address used to register the account, log-in IP addresses associated with session times and dates, account status, alternative e-mail addresses provided during registration, methods of connecting, log files, and means and source of payment (including any credit or bank account number);

c.      All records or other information stored at any time by an individual using the account, including address books, contact and buddy lists, calendar data, pictures, and files;

d.      All records pertaining to communications between the Provider and any person regarding the account, including contacts with support services and records of actions taken.

## II.  Information to be seized by the government

All information described above in Section I that constitutes fruits, evidence and instrumentalities of violations of 26 U.S.C. §§ 7201, 7206(1), 7206(2) and 18 U.S.C. §371, those violations involving REED JULES OPPENHEIMER, and occurring after January 1, 2016, to the date of this application, including, for each account or identifier listed on Attachment A, information pertaining to the following:

a. the establishment of business entities, the purchase and sale of real estate, the solicitation and sale of shares or interests in business entities, appraisals of real estate, the value of real estate, personal and entity-level tax returns and filings, conservation easements, land conservation, mining, charitable donations, charitable deductions, investments, payments for services related to the purchase, sale, appraisal, valuation or value of real estate, land conservation, highest and best use or other use of real property;

b. Evidence indicating how and when the email account was accessed or used, to determine the geographic and chronological context of account access, use, and events relating to the crime under investigation and to the email account owner;

c. Evidence indicating the email account owner's state of mind as it relates to the crime under investigation;

d. The identity of the person(s) who created or used the user ID, including records that help reveal the whereabouts of such person(s).

## CERTIFICATE OF AUTHENTICITY OF DOMESTIC BUSINESS RECORDS PURSUANT TO FEDERAL RULE OF EVIDENCE 902(11)

I, _____, attest, under penalties of perjury under the laws of the United States of America pursuant to 28 U.S.C. § 1746, that the information contained in this declaration is true and correct. I am employed by Google, and my official title is _____. I am a custodian of records for Google. I state that each of the records attached hereto is the original record or a true duplicate of the original record in the custody of Google, and that I am the custodian of the attached records consisting of _____ (pages/CDs/kilobytes). I further state that:

      a.     all records attached to this certificate were made at or near the time of the occurrence of the matter set forth, by, or from information transmitted by, a person with knowledge of those matters;

      b.     such records were kept in the ordinary course of a regularly conducted business activity of Google; and

      c.     such records were made by Google as a regular practice.

I further state that this certification is intended to satisfy Rule 902(11) of the Federal Rules of Evidence.

_____    _____

Date                     Signature